IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 18, 2004 Session

# TAMMY KAY JOINER v. JAMES ALDEN GRIFFITH

**Appeal from the Juvenile Court for Montgomery County**
**No. 98-235     John J. Hestle, Judge**

---

**No. M2003-00536-COA-R3-JV - Filed June 14, 2004**

---

This appeal involves a child support and visitation dispute. Mother and Father, never married, have two minor children. The parties lived together from 1997 until March 2001, when Father was arrested for domestic assault. Father moved out of the residence. Mother filed a complaint seeking to be the primary residential parent, requested child support and arrearages and asked for temporary support and attorney fees. The juvenile court placed primary custody of the children with Mother, set visitation, and ordered Father to pay $4,000 a month in child support plus $31,586 in arrearages. Father appealed, taking issue with visitation, child support, arrearages, and the court's failure to make findings of fact regarding the alleged domestic assault. Mother appealed claiming the court erred by rejecting most of her claim for her attorney fees. We affirm the trial court's determinations concerning child support and visitation, modify the offset against the arrearage owed for child support, and reverse and remand Mother's request for attorney fees. Further, we find that the trial court is not required to make written findings of fact concerning the domestic abuse charge because the alleged domestic assault was not against a minor.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in part, Reversed in part and Remanded.**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM C. KOCH, P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

Rodger N. Bowman and Gregory D. Smith, Clarksville, Tennessee, for the appellant, James Alden Griffith.

Steven C. Girsky and Ralph H. McCoy, Clarksville, Tennessee, for the appellee, Tammy K. Joiner.

**OPINION**

James Alden Griffith (Father) and Tammy Kay Joiner (Mother) have two children, S.N.G. and B.A.G.[1] Father and Mother lived together from 1997 until March 9, 2001 when Father was arrested for an alleged domestic assault on Mother.[2] As a result of the incident and accusations by Father against Mother, S.N.G. was taken into state custody and placed in a foster home. S.N.G. was released to Mother's physical custody on March 22, 2001 with legal custody remaining with the State, pending resolution of the domestic assault charge.[3]

On March 12, 2001, Mother filed a Complaint for Child Support and Other Relief seeking to be the primary residential parent with Father having "liberal visitation," an award of child support and arrearages as well as temporary support and attorney fees.[4] The initial complaint requested relief regarding S.N.G. only, for B.A.G. was not born until the following year, March of 2002. The complaint was orally amended following B.A.G.'s birth to seek similar relief concerning B.A.G. Both parents filed proposed parenting plans designating Mother as the primary residential parent for both children. Their differences pertain to visitation and child support.

Mother had been studying to be a nurse and had not worked in several years. She anticipated graduating in May 2003. Father has been self-employed as an electrical contractor dealing primarily in residential construction since 1989. Father is the sole shareholder of JAG Contractor, Inc. which owns seventy-two apartments and three rental homes. Father testified that his last "good year" was 1998, claiming that he had experienced a seventy percent decrease in business since then. He attributed much of the decline to September 11, 2001 and subsequent events.

Following a hearing, the trial court designated Mother as the primary residential parent and set visitation and child support. Father's visitation with S.N.G., who was three years old, was substantially more liberal than his visitation with the younger child, B.A.G., who was five months old at the time of the hearing and has spina bifida. The court set child support and ordered Father to pay $4,000 per month. The court also issued a judgment for a support arrearage of $31,586.72. The trial court set child support based upon Father's earnings over the previous four years instead of the more typical practice that bases support on the previous two years. The court explained that

---

[1] In the interest of confidentiality, we identify the minors by initials instead of their names.

[2] Mother's complaint indicates that the domestic assault incident occurred on March 9, 2001, however the transcript from the March 28, 2001 hearing suggests that it happened March 10, 2001. For the sake of consistency, we will assume the domestic assault incident occurred on March 9, 2001.

[3] After the March 9, 2001 altercation, the Department of Children's Services became involved. The Department conducted home studies and recommended that both Mother and Father attend anger management classes. Both parents successfully completed the classes. Though there is no order in the record, the transcript reveals that DCS was allowed to withdraw several months later when the judge stated, "I am going to let DCS out of the mix."

[4] Mother's complaint was originally filed in the Chancery Court for Montgomery County, but the matter was transferred to the Juvenile Court for Montgomery County.

the use of a four year average was justified due to the fact that Father is self-employed with a fluctuating income and the recent changes in the economy. The trial court awarded Mother $750.00 for her attorney fees and expenses. She incurred and had requested reimbursement of $15,750 in attorney fees and costs.

Father and Mother both appeal. Father takes issue with the visitation schedule and calculation of child support and arrearages. He also claims the trial court was obligated to make written findings of fact concerning the alleged domestic assault and failed to do so. Mother appeals asserting that the trial court erred by not awarding her all of her attorney fees and expenses.

Visitation Schedule

Father raises two issues concerning the visitation schedule.[5] First, he argues that the visitation schedule should provide for a more equal division of time and that the number of visitation days awarded him, 138 days per year with S.N.G. and approximately 113 days per year with B.A.G., is deficient. He contends that the comparative fitness of the parents justifies a more equal split in time which he claims is in the children's best interest. Second, Father argues that the trial court's limitation on his visitation with B.A.G. is arbitrary, not supported by the facts and constitutes an improper application of the now-abolished tender years doctrine.[6]

Our review of the trial court's decision concerning the children's visitation schedule is *de novo* on the record with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); *Rice v. Rice*, No. M1998-00973-COA-R3-CV, 2001 WL 812258 (Tenn. Ct. App., July 19, 2001) (citing *Nichols v. Nichols*, 792 S.W.2d 713 (Tenn. 1990)). The child's best interest and welfare are of utmost concern in establishing visitation arrangements. *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997); *Bah v. Bah*, 668 S.W.2d 663, 665 (Tenn. Ct. App. 1983). Generally, a child's interests are best served by a custody and visitation arrangement that promotes the development of relationships with both parents. Janet L. Richards, *Richards on Tennessee Family Law*, § 9-1, at 181 (1997).

There are no hard and fast rules for determining what sort of visitation schedule will best serve a child's needs. *Taylor v. Taylor*, 849 S.W.2d 319, 327 (Tenn. 1993). Like determinations regarding child custody, decisions pertaining to visitation often hinge on subtle factors, including the credibility and demeanor of the parties involved. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). Thus the trial court is afforded broad discretion regarding these determinations. *Adelsperger*, 970 S.W.2d at 485.

---

[5]Father's brief expresses dissatisfaction with the trial court's "visitation/custody shared parenting plan", however a closer look reveals that custody is not being challenged as he and Mother both designated Mother as the primary residential parent in their proposed parenting plans.

[6]The tender years presumption has been abolished, effective May 13, 1997. W. Walton Garrett, *Tennessee Divorce, Alimony and Child Custody* § 24-6, at 339 (2000).

The trial court set the following visitation for Father with the older child, S.N.G. Until S.N.G. begins kindergarten, Father shall have every other weekend from Friday at 6:00 p.m. until Sunday at 6:00 p.m. One day during the week Father will pick up the child at day care in the morning and return her to day care by 12:00 p.m. the following day. He will choose one day during the week for telephone visitation. Father shall be allowed visitation five consecutive days, five times per year. He can link those days with one of his weekend visits. The parties will alternate having S.N.G. on her birthday until she starts attending school. The parties will alternate holidays until S.N.G. starts school. When Mother becomes regularly employed, Father can pick up the child at day care and keep the child until two hours prior to Mother picking child up at the day care. When S.N.G. begins attending school, Father will have her on the same schedule as pre-school– every other weekend but the five weeks visitation will be discontinued. Father will be allowed to visit S.N.G. at school whenever the school permits, i.e., eating lunch, school programs. He will have her on spring break and every other week during the summer. Father will have S.N.G. for one week at Christmas and the parties will alternate Thanksgiving. The parties will alternate Mother's Day and Father's Day. When S.N.G. is in school, the parent who has physical custody will make sure the child gets to all school functions and athletic events.

The visitation schedule with S.N.G. is not unusual. It is relatively typical and customary. There is no evidence before us to suggest the trial court was arbitrary in setting Father's visitation with S.N.G. To the contrary, the schedule appears to be in S.N.G.'s best interest.

Father argues that the court erroneously applied the now-abolished tender years doctrine to set visitation for B.A.G. The trial court stated that it limited visitation with B.A.G. due to her medical complication. She has spina bifida, a very debilitating condition. That schedule is:

> The Court is setting the pre-three-year-old visitation understanding that there are medical problems that may have to be addressed. The Court is not concerned about the Mother nursing the child since she is leaving the child at day care.

> The Court believes that, for the next six months, Father should only have B.A.G. on a daytime basis. Due to his work schedule, it would seem appropriate that Father visit the child as much as he can at the day care center and every other Saturday from 8:00 a.m. until 4:00 p.m. After the first six months, Father shall have the child every other weekend, but not for the five-week prior. This will be until B.A.G. turns three years of age. Parties will have the same visitation with B.A.G. as with S.N.G. once B.A.G. turns three (3) years of age.

At the April 25, 2002 hearing, the court stated that it would base its determination on the information contained in the proposed plans filed by the parties.[7] Specifically, the court stated:

---

[7]Both parties' plans designated Mother as the primary residential parent.

The Court recognizes that the child [B.A.G.] has a medical condition. The Court would entertain any information from a doctor concerning the child's medical condition that might make this visitation not to be in the best interest of the child. Each party can have their medical doctor submit a letter and, if necessary, a hearing can be held. The Court stands ready to work around the child's medical condition at any time.

While the visitation schedule for B.A.G. is much more restricted and is not the more typical visitation schedule, we find nothing in the record to suggest that the trial court applied the tender years doctrine. The court encouraged Father to present medical evidence to justify a more liberal schedule or to establish that the trial court's determination was not in B.A.G.'s best interest; however, he failed to present any such evidence. It is obvious from the fact that the court set different visitation schedules for the children due to their different medical conditions that the trial court took into consideration the best interests of the children.

There is ample evidence to justify additional restrictions for visitation with B.A.G. Accordingly, we find that setting a more liberal visitation schedule with the older and healthier child and a more restricted schedule for the child with spina bifida is justified. Therefore, since the evidence does not preponderate against the trial court's rulings regarding visitation, we affirm the trial court concerning the visitation schedules.

## Child Support

Father challenges the monthly child support award and the arrearage. Specifically, Father argues that the trial court erred in setting support at $4,000 per month by inferring an inflated net income rather than relying on his corporate and personal tax returns. He also argues that the court erred by averaging his income over the previous four years instead of two years as provided in Tenn. Comp. R & Regs. r. 1240-2-4-.04(1)(e). Father challenges the arrearage set at $31,586 on two grounds. The first is the same argument as above concerning the monthly support. The second is that the trial court failed to give him credit for $4,500 he allegedly provided after the parties separated.

We review the trial court's decision concerning child support using the abuse of discretion standard of review. *State ex. rel. Vaughn v. Kaatrude*, 21 S.W. 3d 244, 248 (Tenn. Ct. App. 2000). The abuse of discretion standard requires us to consider, "(1) whether the decision has a sufficient evidentiary foundation, (2) whether the trial court correctly identified and properly applied the appropriate legal principles, and (3) whether the decision is within the range of acceptable alternatives." *Id.* This court will not substitute its judgment for that of the trial court "merely because we might have chosen another alternative." *Hanselman v. Hanselman*, No. M1998-00919-COA-R3-CV, 2001 WL 252792, *2 (Tenn Ct. App., March 21, 2001).

In explaining its determination of child support, the trial court stated that this was not an ordinary case due to the fact that Father was self-employed, his financial records were incomplete

and questionable and Father, who claimed he had no income due to business losses, continued to live a grand lifestyle and continued to purchase luxury items with cash. The trial court noted, "[T]he guidelines, both federal and state, were followed to the extent in this case that they could be followed. . . . The defendant was living a very grand lifestyle that certainly showed that he was making more money than set out in the income tax returns and paperwork filed with the court." The trial court further stated:

> The Court finds that the guidelines reflect that the clear intent of the legislature as to what both gross and net income is to be calculated for child support issues and the Court has taken all of these items into consideration in setting the amount. In utilizing these, the Court for the year 2001 took into consideration those factors that were herein above set out and came up with his wages based on social security or approximately $5,000.00 per month, and that his W2 showed interest income of $15,000.00 which average out to approximately $1,507.00 that he received from his gross interest income. The Court added back in the approximate $114,000.00 deductions from JAG and his schedules from his income tax returns which came to approximately $174,000.00, which times 32% would equal approximately $55,525.00 divided by 12 which was $4,628.00 per month, which the court averaged that for the four (4) and utilized the other factors and came up with the sum of $4,000.00 per month child support obligation.

The trial court acknowledged that Father's financial picture appeared to have been affected by the economy since the tragedy of September 11; however, the court questioned the validity and completeness of Father's financial reports. The court further commented that losses allegedly sustained by Father appeared to have no impact on his lifestyle. Moreover, the court observed that Father had paid cash for several expensive items including a swimming pool, a car and a fence. Of further significance, the court noted that Father had not been forthcoming with complete financial documentation and information. The trial court stated, "The father did not provide every bit of the information that I would have liked to have had to make this decision, but . . . from what I have – the exhibits I've seen that have been filed with the Court, the Court is going to set the support based upon these documents." The court further stated that Father's failure to file the requested documents was "due to the fact that they revealed other sources of income and/or other sources of money."

In part, Father argues that the trial court should have used the average income over the most recent two years, not four years. He principally relies on Tenn. Comp. R. & Regs. r. 1240-2-4-.04 (1)(e)(2) which provides that the "*retroactive support* amount shall be calculated based upon the guidelines using the average income of the obligor over the past two (2) years, and is presumed to be correct unless rebutted by either party." (emphasis added). His argument however is overstated for this guideline has limited application. Simply stated, the two year provision is only applicable when setting "retroactive support." There is no corresponding two year provision in the guidelines for setting "prospective support," and periods of four years have been approved depending on the circumstances. It is up to the trial court to determine on a case-by-case basis the most appropriate way to average fluctuating income. *Hanselman*, 2001 WL 252792, at*3. "Periods of one year or

longer, including two, three, or four years, have been consistently approved depending on the circumstances (citations omitted)." *Tinsley v. Tinsley*, No. M2001-02319-COA-R3-CV, 2002 WL 31443210, *4 (Tenn. Ct. App., November 1, 2002). Moreover, the time period to be used lies within the discretion of the trial court based upon the facts of the situation. *Id*. at *4. Thus, the question concerning the two year window is limited to the award of retroactive support and whether the trial court was justified to deviate from the two year period stated in the guidelines when setting retroactive support.

The trial court may deviate from the guidelines if it is in the best interest of the child(ren). Tenn. Comp. R. & Regs. r. 1240-2-4-.04(2). "In deviating from the guidelines, primary consideration must be given to the best interests of the child(ren) for whose support the guidelines are being utilized." Tenn. Comp. R & Regs r.1240-2-4-.04(5). Where an obligor parent's income is subject to variation, averaging is appropriate to determine net income for the purpose of calculating child support." *Alexander v. Alexander*, 34 S.W.3d 456, 460 (Tenn. Ct. App. 2000).

Here, the trial court was faced with the daunting task of setting support for a father who was self employed, whose income fluctuated, and whose lifestyle appeared to belie his stated income. As stated above, it is up to the trial court to determine the most appropriate way to average fluctuating income. Moreover, when setting prospective support, periods of one, two, three or four years have been approved depending on the circumstances. While the guidelines provide that the two year window is to be used when setting retroactive support, and is presumed to be correct unless rebutted, we find sufficient evidence in the record to justify the trial court's decision to deviate from the two year guideline. This is particularly justified due to the fluctuation in Father's income, the fact that the trial court found Father's financial evidence to be incomplete and questionable, and it found that Father's lifestyle and purchases of luxury items with cash to belie his stated income.

Using the abuse of discretion standard, we see no basis to second guess the trial court's decision setting retroactive support and/or prospective support. Therefore, we affirm the trial court's decision setting child support at $4,000 per month.

<u>Arrearage</u>

Father's challenge to the arrearage award of $31,586.72 is based in part on the monthly support discussed above and on the argument that the trial court did not give him credit for $4,500 he allegedly provided after the parties separated. We have already discussed the court's calculation of monthly retroactive support, therefore we will limit our discussion to the alleged offset of $4,500.

Father testified in a hearing on April 25, 2002 that he gave Mother $4,500 when they separated to help her become stabilized. Mother presented no evidence to directly challenge Father's testimony that he provided this support. It was not until the May 28, 2002 hearing when the court ruled on the arrearage that Mother questioned the payment through argument by her counsel. After the trial court announced that it was setting the arrearage at $31,586.72, Father's attorney asked if the $4,500 payment was factored into the arrearage. Mother's attorney responded, "Your Honor, we

dispute those figures. There were some payments made, but the purpose of the payments is subject for proof, and I just don't think it's appropriate at this stage." The trial court then stated, "The Court is not going to consider that. And I don't remember that. As you say, that was probably disputed."

The record reveals that Father testified that he paid $4,500 to Mother as support for her and the children, and no evidence was introduced to contradict his testimony. While Father's testimony on this issue is less than compelling, it is nonetheless uncontroverted. Accordingly, Father's testimony is sufficient to entitle Father to an offset of $4,500. Thus, the arrearage set at $31,586.72 must be reduced by $4,500. Therefore, the trial court's award for the arrearage is modified to $27,086.72.

### Findings of Fact Regarding Alleged Domestic Assault

Father's final issue is the contention that the trial court had an affirmative duty to make written findings of fact regarding the alleged domestic assault. This is a question of law and is therefore reviewed *de novo* with no presumption of correctness. Tenn. R. App. P. 13(a); *Jahn v. Jahn*, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996).

At the March 14, 2001 hearing the trial court announced that the domestic assault charge would be dismissed without any finding of guilt. Of particular significance, the trial court stated, "I'm not going to convict anybody in that case because they've made progress toward working out the domestic part. . . . I will enter a dismissal of that charge,[8] and that will clean that up." Neither party objected to the court's comments or decision.

Father asserts that the trial court is required to but failed to make written findings of fact. The statute upon which Father relies is Tenn. Code Ann. § 36-6-106(a)(8). Section (a) provides, "In . . . any . . . proceeding requiring the court to make a custody determination regarding a minor child, such determination shall be made upon the basis of the best interest of the child. The court shall consider all relevant factors including the following where applicable." The statute sets forth ten relevant factors. The eight relevant factor is evidence of physical or emotional abuse to the child, to the other parent or to any other person. Unfortunately, subsection eight contains additional provisions and is in-artfully drafted. The entire subsection reads:

> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in § 39-15-401 or § 39-15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court

---

[8] At the March 14, 2002 hearing, the court said it would dismiss the domestic assault charge on "the 28[th]", however at the March 28, 2002 hearing, there was no mention of the domestic assault incident.

shall include in its decision a written finding of all evidence, and all findings of facts connected thereto.

Tenn. Code Ann. § 36-6-106(a)(8).

This court in *Nelson v. Nelson*, 66 S.W.3d 896 (Tenn. Ct. App. 2001) construed Tenn. Code Ann. § 36-6-106(a)(8) to require the trial court to make written findings of fact. We concur with the holding in *Nelson* to the extent the trial court finds evidence of child abuse; however, we do not interpret the statute to require written findings in every case that involves allegations of abuse against a family member. The first clause of subsection (8) is simply the eighth of ten relevant factors the trial court is to consider when making a custody determination regarding a minor child. Unfortunately, the subsection addresses other matters including an affirmative duty that the trial court make written findings of fact in certain situations. The latter and pertinent part of the statute states, "where there are allegations that one (1) parent has committed child abuse . . . or child sexual abuse . . . against a family member, the court shall . . . determine . . . whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto." Tenn. Code Ann. § 36-6-106(a)(8). If one focuses only on the phrase "against a family member" without referring back to the two limiting provisions, child abuse or child sexual abuse, the statute appears to require written findings when there is alleged abuse against any family member. However, the preceding clause limits the scope of the pertinent provision to abuse against a family member that constitutes *child* abuse or *child* sexual abuse. Moreover, the final sentence of Tenn. Code Ann. § 36-6-106(a)(8) provides, "In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings." This provides further evidence of the limited application of this section for it would be inappropriate to refer the matter to the juvenile court for further proceedings if an adult was abusing another adult. Thus, the affirmative duty of the trial court to make written findings of fact is limited to alleged abuse against a family member who is a minor child. Accordingly, Tenn. Code Ann. § 36-6-106(a)(8) does not require the trial court to make written findings of fact when the alleged abuse is against an adult family member, as is the case before us. Therefore, the trial court is not under a duty to make findings of fact as Father has demanded.

### Mother's Attorney Fees

Finally, Mother claims that the trial court erred when it refused to award all of her attorney fees and necessary expenses associated with this action, both at the trial level and on appeal. On July 23, 2002, the trial court awarded Mother $750 towards her legal fees and costs in this matter but refused to award additional fees and costs, asserting that it had provided Mother with sufficient funds to bear her own legal expenses. Her legal expenses totaled $15,750.

Although it is not clear, the $750 awarded to Mother appears to represent the fee of Rick Lowe, CPA, for testifying on behalf of Mother regarding Father's tax returns.[9] Mother's attorneys of record, Steven Girsky and Ralph McCoy, requested fees of $9,250 and $6,500 respectively. In its final order, the trial court declined to award Mother additional fees, explaining that it had awarded Mother a large amount of money and felt that Mother should bear some of the financial burden.

Tenn. Code Ann. 36-5-103(c) provides that the trial court has the discretion to award reasonable attorney fees if said fees are incurred in enforcing any decree for child support. We will not intervene with the trial court's decision concerning an award of attorney fees, absent an abuse of discretion. *Garfinkle v. Garfinkle*, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996).

There are transcripts from numerous hearings, yet it is obvious that there were as many, if not more, hearings for which we have no transcript, only court minutes. Accordingly, we have an incomplete picture of the hearings and the conduct of the parties at the hearings. While we are reluctant to second guess the trial court, the record is compelling that Mother incurred substantial legal expenses to obtain support for her children. Whether Mother was unnecessarily obstructive during the protracted process or incurred unnecessary fees is not revealed in the record before us.

The trial court has the discretion to assess reasonable attorney fees against Father and award them to Mother to the extent the fees are incurred in enforcing a decree for child support. The trial court's stated justification for its award was that it had awarded Mother a large amount of money and felt that Mother should bear some of the financial burden. We are unable to justify the trial court's decision to only award five percent of Mother's legal fees. Perhaps Mother should bear "some" of the burden, but we find the trial court exceeded its discretion by limiting her recovery to a mere $750 out of $15,750. Accordingly, we vacate the trial court's denial of Mother's attorney fees and remand this issue for the trial court to reconsider the award of attorney fees and expenses incurred by Mother.

Costs of appeal are assessed against Appellant/Father, James Alden Griffith.

_____
FRANK G. CLEMENT, JR., JUDGE

---

[9]This is suggested in Ralph McCoy's Response to Defendant's Reply to Application for Attorney's Fees. Furthermore, it is unclear whether Rick Lowe's fee is included in Ralph McCoy's fee request of $6,500, however it is immaterial to this appeal.